IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MICHAEL HOFFMAN,                    *

     Plaintiff,                          *

v.                                  *    Civil Action No. GLR-19-3644

ASRESAHEGN GETACHEW, M.D., and      *
CORIZON HEALTH,
                                    *
     Defendants.

                        ***

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on Defendants Asresahegn Getachew, M.D.'s, and Corizon Health, Inc.'s ("Corizon") (together with Getachew, "Defendants") Motions to Dismiss or, in the Alternative, Motions for Summary Judgment (ECF Nos. 15, 20). The Motions are ripe for disposition, and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will grant the Motions, which it construes as motions for summary judgment.

### I.    BACKGROUND

**A.    <u>Plaintiff's Allegations</u>**

Plaintiff Michael Hoffman is a state inmate presently housed at the Western Correctional Institution in Cumberland, Maryland ("WCI"). (Compl. at 1, ECF No. 1). He alleges that Getachew, the Medical Director at WCI, filed an affidavit in another civil rights case filed by Hoffman characterizing Hoffman as a hypochondriac and "recognized drug seeker." (<u>Id.</u> ¶¶ 3–4). Hoffman states that he suffers from a degenerative joint disease that causes him constant pain. (<u>Id.</u> ¶ 6). He has been incarcerated for nineteen years, is a former

intravenous drug user, and contracted the hepatitis C virus ("HCV") from his drug use. (Id. ¶¶ 7–8). Hoffman states that he told medical staff about "his drug use in order for them to know the over-all damage Plaintiff caused his body." (Id. ¶ 9). Hoffman alleges that the staff used his words against him to "deny him medical treatment and to slander his name." (Id. ¶ 10). Hoffman reports that during his incarceration he has submitted to several random urinalyses, all of which have been clean. (Id. ¶ 11). Additionally, Hoffman states that prison staff have searched his cell hundreds of times over the course of his incarceration and found no drugs or evidence of medication hoarding. (Id. ¶ 12).

Hoffman has taken several steps towards recovery. He attended alcoholics and narcotics anonymous meetings from July 2011 through July 2013. (Id. ¶¶ 13–14). In 2014, he completed a baptismal class and bible study. (Id. ¶ 15). Hoffman also completed anger management classes and obtained his G.E.D. during his incarceration. (Id. ¶¶ 17–18).

Hoffman reports that he suffers from "chronic interstitial lung disease, heart disease and bone degenerative disease." (Id. ¶ 19). He has bone spurs between his L4 and L5 vertebrae and suffers from back, shoulder, knee, and "all-over joint pain." (Id. ¶ 20). He also has paranasal sinusitis in the right nasal cavity and a bloody polyp growing in the left nasal cavity. (Id.).

On September 11, 2019, Dr. Bernard McQuillan saw Hoffman for a scheduled sick call. During the visit, McQuillan advised Hoffman that Getachew had directed that Hoffman be prescribed only Motrin and that Hoffman not be provided with muscle relaxers. (Id. ¶ 21).

Following this visit, Hoffman submitted numerous sick call slips regarding knee pain, sinusitis, and bloody polyps, and requesting a flu shot. (Id. ¶ 22). He was seen by Janette Clark, N.P., on November 23, 2019. (Id.). At that visit, Clark told Hoffman that she could not prescribe him pain medication or muscle relaxers because she had been told that he was a drug seeker and hypochondriac. (Id.).

Hoffman claims that medical department staff at WCI are "close friends" with the defendants named in a separate pending action before this Court, Hoffman v. Barrera, et al., No. GLR-17-2431 (D.Md. filed Aug. 24, 2017). (Id. ¶ 23). Hoffman states that as Getachew is the one who gave the verbal orders regarding his medical treatment, he is the sole individual Defendant named in this case. (Id.). Hoffman further alleges that he has submitted numerous requests to review his medical file. (Id. ¶ 24). He speculates that after filing this case, his medical records would "come up missing" when he tried to request them. (Id.).

Hoffman claims that Getachew is denying him medical treatment for his degenerative disease in both knees and his right foot. (Id. ¶ 25(A)). He claims that the damage in his knees is now irreversible despite Hoffman having submitted sick call slips and administrative remedy procedure ("ARP") complaints seeking to be seen by an orthopedist. (Id.). Getachew allegedly refused to schedule such a visit for Hoffman because he believes Hoffman is a drug seeker and a hypochondriac. (Id.).

Hoffman states that on May 17, 2012, he received a computed tomography ("CT") scan of his brain, which revealed a diagnosis of acute paranasal sinusitis. (Id. ¶ 25(B)). He was prescribed a variety of nasal spray and allergy medications, but none resolved the

sinusitis. (Id.). Hoffman submitted numerous sick call slips and ARPs regarding this issue and sought a referral to an otolaryngologist (i.e., an ear, nose, and throat doctor, or "ENT"). (Id.). Getachew, however, refused to refer him to an ENT because he believes Hoffman is a drug seeker and hypochondriac. (Id.).

In 2016, Hoffman discovered a growth in his left nasal cavity that has since continued to spread. (Id. ¶ 25(C)). Hoffman again requested to be seen by an ENT, but Getachew refused his request because he believes Hoffman is a hypochondriac and drug seeker. (Id.).

Hoffman is a chronic care patient who has received an annual flu shot each year for the past eighteen years. (Id. ¶ 25(D)). He suffers from lung and heart disease and a weak immune system. (Id.). For two months, Hoffman submitted sick call slips and verbally requested that the be provided the flu shot, but was not provided one. (Id.).

Hoffman states that he will not be able to prove that he requested medical treatment and consultation with a specialist because the medical record department has ignored his requests for such documentation. (Id. ¶ 26). He claims that the medical department has a "new policy [whereby] the records [department] sends a form to sign claiming that you already received your copies and that when you send it back . . . then they will release the copies to you." (Id.). Hoffman twice signed and returned the form but did not receive the copies of his medical records. (Id.). Hoffman alleges that the medical department retains less paperwork because inmates were "winning a lot of [42 U.S.C. §] 1983 civil cases against them." (Id. ¶ 27).

Hoffman contends that since Corizon employs the medical staff at WCI, and Getachew is an employee of Corizon, Corizon is responsible for Getachew's actions. (Id. ¶ 28). Hoffman further states that it is impossible for him to get proper medical care at WCI because Getachew believes he is a drug-seeking hypochondriac. (Id. ¶ 29).

## B.   **Defendants' Response**

Getachew is the Regional Medical Director for Corizon. In this role, he oversees the North Branch and Western Correctional Institutions. (Defs. Corizon Health, Inc. & Asresahegn Getachew, M.D.'s Mot. Dismiss Alt. Summ. J. ["Defs.' Mot."] Ex. A ["Getachew Decl."] ¶ 2, ECF No. 20-4). Corizon became the contracted medical provider for the Maryland Department of Public Safety and Correctional Services ("DPSCS") on January 12, 2019. (Id.; Def. Getachew's Mot. Dismiss Alt. Summ. J. ["Getachew Mot."] Ex. 2 ["Getachew Aff."] ¶ 14, ECF No. 15-5). Before that date, Wexford Health was the contract holder. (Id.).

Hoffman suffers from bipolar disorder, candidiasis, hypertension, HCV, hypothyroidism, hyperlipidemia, and complaints of chronic chest, lung, and back pain. (Getachew Decl. ¶ 6). Getachew denies directing any medical providers regarding Hoffman's course of treatment and avers that the treatment decisions of Hoffman's medical providers "were based on those providers' medical judgment." (Id. ¶ 5).

Hoffman submitted a sick call slip on November 20, 2016, complaining of a growth in his left nostril. (Getachew Mot. Ex. 1 ["1st Med. R."] at 2, ECF No. 15-4). He was seen two days later at nurse sick call. The examination showed a small pimple-like area on the inside of the left nostril. (Id. at 3). No bleeding or swelling was observed. (Id.). Hoffman

was conversant with no shortness of breath and was oriented to person, place, and time. (Id.). He walked without difficulty and did not appear to be in any pain. (Id.). Medical staff advised him to monitor his condition and report if there was swelling, excessive bleeding, or an increase in pain. (Id.). They also instructed him to apply warm compresses to relieve what they thought could be an infection from an ingrown hair. (Id.).

Hoffman submitted another sick call slip on December 3, 2016, again complaining of sores in his left nostril and reporting that they caused pain in his left eye and left ear. (Id. at 4). He was seen three days later at nurse sick call. (Id. at 5). He complained of nasal dryness with occasional nosebleeds. (Id.). His nostrils appeared normal. (Id.) There were no signs of trauma or abnormal growths. (Id.). He was referred to a provider. (Id.).

On March 24, 2017, Hoffman submitted a sick call complaining that his allergies had worsened and his sinuses were closed, making it difficult to breathe through his nose. (Id. at 7). He was seen at nurse sick call three days later but became agitated when security gave him a directive and left the clinic before an examination could occur. (Id. at 8).

Hoffman submitted a sick call slip on July 2, 2017, complaining that his right sinus was running. (Id. at 9). He was seen three days later at nurse sick call but did not complain of a growth, pain, or bleeding in his left nostril. (See id. at 10–11). Instead, he complained of lung disease, painful urination, and acute sinusitis, and asked about medication renewal. (Id.). He was referred to a provider. (Id.).

Holly Pierce, N.P., examined Hoffman on August 11, 2017. (Id. at 12–13). Hoffman complained of increased urination but did not complain of a growth, bleeding, or pain in his left nasal cavity. (See id.). The following month, Hoffman filed a sick call slip

complaining that his sinuses kept draining. (Id. at 14). He was seen for this complaint on September 21, 2017, and complained of a running nose and watery eyes but did not complain of a growth, pain, or bleeding in the left nostril. (See id. at 15). Pierce again examined Hoffman on February 6, 2018, and no mucosal lesions or nasal deformities were noted. (See id. at 17–18).

Hoffman filed a sick call slip on March 27, 2018, complaining that his left sinus cavity constantly bled. (Id. at 19). He was seen at nurse sick call two days later, but at that time only complained of a chronic cough and sore throat. (Id. at 20–21). He did not complain of pain or left nostril growth or bleeding. (Id.).

On May 18, 2018, Hoffman submitted a sick call slip complaining that the sore in his left nostril was spreading into the upper nasal cavity. (Id. at 22). He did not attend a scheduled sick call on May 21, 2018, because he was off site at the time of his appointment. (Id. at 23). Pierce evaluated Hoffman on May 31, 2018, in the chronic care clinic. (Id. at 24–27). Hoffman did not complain of a growth, bleeding, or pain in the left nostril. (Id.).

Hoffman filed a sick call slip on July 8, 2018, complaining that his left nasal cavity was sealed by a sore. (Id. at 28–29). He refused, however, to be seen for this complaint when called to nurse sick call. (Id.). Pierce next evaluated Hoffman on September 12, 2018, in the chronic care clinic. (Id. at 30–33). He did not complain of a growth, bleeding, or pain in the left nostril, and denied suffering from nosebleeds. (Id.). No nasal deformities or mucosal lesions were observed.[1] (Id.).

---

[1] From July 8, 2018 through at least November 22, 2019, Hoffman did not submit any complaints of a nasal cavity lesion or sore, bleeding, or pain in the left nasal cavity.

Getachew explains that sinusitis refers to inflammation of the tissue lining the sinuses and that acute sinusitis can be caused by a cold or allergies and may resolve on its own. (Getachew Decl. ¶ 9). Symptoms of sinusitis can include headache, facial pain, runny nose, and nasal congestion. Treatment can involve symptom relief via the use of pain medication, nasal decongestants, nasal saline rinse, or antibiotics. (Id.). Acute sinusitis usually resolves within seven to fourteen days. (Id.).

Hoffman submitted a sick call slip on January 19, 2019, complaining of pain in his shoulders, knees, upper back, and neck, and sinusitis. (Defs.' Mot. Ex. A-1 ("2d Med. R.") at 189, ECF No. 20-5). He was evaluated on February 1, 2019, by a cardiothoracic surgeon for interstitial lung disease. (Id. at 105–08). Hoffman complained of body-wide joint pain and a runny nose, but did not report any other ear, nose, or throat issues. (Id.). Hoffman's neck was supple and exhibited a normal range of motion. (Id.). Hoffman was evaluated later that month for complaints of pain in the shoulders and lower back. (Id. at 10–11). The nurse referred Hoffman for further assessment and ordered a muscle rub. (Id. at 235).

Getachew evaluated Hoffman on March 11, 2019, in the chronic care clinic for HCV, hypertension, hypothyroidism, and interstitial lung disease. (Id. at 12–14). Hoffman did not report any symptoms suggestive of hypothyroidism and his thyroid levels were normal. Hoffman also reported that his chronic pain was relieved by naproxen, which Getachew then prescribed. (Id.). Additionally, the HCV had resolved after treatment. (Id.). An examination revealed no significant abnormalities. (Id.). In response to Hoffman's

_____

(Getachew Aff. ¶ 12). Additionally, Dr. Getachew never personally saw Hoffman for complaints of left nasal cavity lesion, bleeding, or pain. (Id. ¶ 16).

complaint of shortness of breath, Getachew noted that medical staff were awaiting the report of a pulmonary specialist and that Hoffman would be rescheduled for evaluation after the report was received. (Id.).

Getachew again evaluated Hoffman in the chronic care clinic on April 1, 2019. (Id. at 17–19). Hoffman was not in distress and his neck was supple. He did not complain of musculoskeletal pain, sinusitis, or growth in his left nasal cavity. (Id.). During a nursing visit later that month, Hoffman, who walked without difficulty and whose extremities were within normal limits, asserted that he had been prescribed Elavil, an antidepressant also used to treat arthritic and musculoskeletal pain, and baclofen, a muscle relaxer. (Getachew Decl. ¶ 15; 2d Med. R. at 20–21). After reviewing Hoffman's medical records, the nurse noted that Hoffman had not been prescribed those medications. (2d Med. R. at 20–21).

John Glenn Williams, M.D., evaluated Hoffman on May 9, 2019 in the pulmonary clinic. (Id. at 109–12). Hoffman reported sinus or nasal congestion that was worse on the right side. He denied rhinorrhea or postnasal drip. (Id.; see also Getachew Decl. ¶ 16). No abnormalities were observed in Hoffman's nose. (2d Med. R. at 111). Hoffman also reported back pain, but the assessment of his lower extremities was limited. (Id. at 109, 111). Williams ordered laboratory testing to determine whether Hoffman suffered from a rheumatological disorder. (Id. at 112).

On May 10, 2019, Hoffman was observed after returning from a medical visit walking with a steady gait and apparently in stable condition. (Id. at 26–27). Two days later, a nurse saw him for complaints of discomfort while urinating and he was referred to a provider. (Id.). Later that month, a nurse evaluated Hoffman due to complaints of chronic

pain. (Id. at 31–32). No injuries were observed and Hoffman was referred to a provider. (Id.). Laboratory testing conducted on May 31, 2019 and June 17, 2019 did not reveal results consistent with a rheumatological disorder. (Getachew Decl. ¶ 20; 2d Med. R. at 249–52).

On June 11, 2019, Pierce submitted a request for consultation with a rheumatologist and for a pulmonary function test on Hoffman's behalf. (2d Med. R. at 34–37). The request was approved. (Getachew Decl. ¶ 21; 2d Med. R. at 253–55). When a rheumatologist eventually did review Hoffman's medical record, it was determined that a consultation was not necessary. The rheumatologist suggested that Hoffman be referred to a pain management specialist. (2d Med. R. at 253).

Pierce evaluated Hoffman on June 18, 2019 in the chronic care clinic. (Id. at 38–41). At that time, Hoffman was compliant with his medication regimen but not with diet and exercise. Hoffman reported suffering from migraines and headaches but denied any ear, nose, or throat symptoms, including nosebleeds. (Id.). He reported problems urinating and complained of pain in his chest, lungs, bilateral shoulders, and upper and lower back. (Id.). He also reported that he had bone spurs between the vertebrae in his back and complained of sciatic pain on the left side that went down his left leg. (Id.). He reported degenerative joint disease ("DJD") in both knees and right foot and requested a specialist evaluation for these issues. (Id.). Examination revealed no musculoskeletal abnormalities. (Id.). Pierce prescribed naproxen and ordered x-rays of Hoffman's lumbar spine and both knees. (Id.).

Getachew explains that DJD, also known as osteoarthritis, is an irreversible condition which refers to age-related degenerative changes in the joints. (Getachew Decl. ¶ 7). Getachew further explains that the vast majority of patients the same age as Hoffman experience deterioration of their joints. (Id.). Arthritis and DJD are treated conservatively, initially with pain medication, such as acetaminophen and nonsteroidal anti-inflammatories ("NSAIDs"), and by remaining physically active. (Id.). If the joint deteriorates significantly, more aggressive treatment may be pursued. (Id.). In light of the complications that can occur from surgery, doctors typically begin with a conservative course of treatment. (Id.).

On July 9, 2019, Hoffman's lumbar x-ray showed mild degenerative changes at multiple levels in the lumbar spine. (2d Med. R. at 119). Both Hoffman's left and right knee x-ray showed a small osteophyte at the superior aspect of the patella, but no other abnormalities. (Id. at 121). An osteophyte is a bony growth that develops along bone edges. (Getachew Decl. ¶ 21). Osteophytes are generally caused by DJD. If bone spurs are symptomatic, pain relievers such as acetaminophen or NSAIDs may be helpful. (Id.).

Hoffman saw a nurse on July 29, 2019 for a rash on his penis and was provided antifungal cream. (2d Med. R. at 42–43). He was seen again on August 8, 2019, in conjunction with his transfer between institutions. (Id. at 52, 129). At that time, he requested a chronic care appointment, an optometry appointment, an MRI of his leg and back, dentures, and treatment for an infected penis. He was referred for a medical assessment. (Id.).

On August 15, 2019, Hoffman was seen by a nurse for his complaints of pain due to bone spurs. (Id. at 53–54). He also complained of pain in both knees and his right foot. (Id.). He walked without difficulty and his legs, ankle, and feet were not swollen. He was referred to a provider. (Id.).

On August 23, 2019, a nurse saw Hoffman for his complaint of bilateral foot swelling. (Id. at 56–57). Slight swelling was observed in Hoffman's feet, although both his gait and respiration were normal. (Id.). He was referred to a provider. (Id.). McQuillan saw Hoffman for his complaints of swelling and for a rash on his penis. (Id. at 58). McQuillan noted that Hoffman's hypertension had been treated with Norvasc and prescribed lisinopril and ordered laboratory testing. (Id.). On August 28, 2019, Hoffman refused to be seen at nurse sick call for his complaints of pain. (Id. at 61, 127).

McQuillan examined Hoffman on September 11, 2019, for his periodic physical. (Id. at 75–76). Hoffman did not voice any complaints of joint pain, sinusitis, or a left nasal cavity growth. (Id.). McQuillan noted that Hoffman suffered from chronic hypertension, hyperlipidemia (high cholesterol), and HCV. (Id.). Hoffman's neck was supple and examination of his ear, nose, and throat unremarkable. (Id.). His ear canals were clear and his tympanic membranes normal. (Id.). Hoffman had full range of motion in his extremities and intact tendon reflexes. (Id.). McQuillan renewed Hoffman's prescriptions for Zocor, fish oil, hydrochlorothiazide, Prilosec, lisinopril, and naproxen. (Id.). Hoffman did not appear for his September 19, 2019 scheduled chronic care appointment with McQuillan. (Id. at 77).

On September 26, 2019, Hoffman underwent a pulmonary function test and his results were within normal limits. (<u>Id.</u> at 85, 115–18). When he returned from the test, medical staff noted that he walked with a steady gait. (<u>Id.</u>).

McQuillan next evaluated Hoffman on October 7, 2019, in the chronic care clinic. (<u>Id.</u> at 86–87). At that time, Hoffman reported transient chest pains, but reported no other musculoskeletal symptoms, including joint pain, swelling, or weakness, and no abnormalities of his musculoskeletal system were noted. (<u>Id.</u>). Specifically, no swelling or discoloration of Hoffman's extremities were observed. (<u>Id.</u>; Getachew Decl. ¶ 32). Further, no abnormalities were seen in Hoffman's ears, nose, mouth, throat, or neck. (2d Med. R. at 86–87). McQuillan prescribed ibuprofen. (<u>Id.</u> at 203).

On October 16, 2019, a nurse evaluated Hoffman due to his complaints of pain in both knees. (<u>Id.</u> at 88–89). Hoffman was observed walking with a steady gait and was not in distress. (<u>Id.</u>). During the visit, he denied pain and was instructed to continue with the provider's plan of care. (<u>Id.</u>).

On October 19, 2019, Clark evaluated Hoffman for complaints of pain in his chest, lower lungs, both knees, and penis. (<u>Id.</u> at 90–91). Clark noted that Hoffman's chest pain was not new and that he had been seen by a pulmonary specialist. (<u>Id.</u>). She also noted that Hoffman had a pending appointment with a dermatologist. (<u>Id.</u>). Clark also reviewed Hoffman's July 9, 2019 lumbar spine and knee x-rays. (<u>Id.</u>). Hoffman did not exhibit any nasal deformities. (<u>Id.</u>). Additionally, he walked without a limp and was able to get on and off the examination table without difficulty. (<u>Id.</u>). He did not have any swelling or discoloration in his extremities. (<u>Id.</u>). Clark ordered diaper rash spray but did not order any

additional medications. (Id.). The following month, a nurse saw Hoffman for complaints of knee pain and a rash. (Id. at 93). Hoffman requested pain medication and a knee brace, and the nurse noted that follow up was already scheduled with a provider. (Id.).

Clark saw Hoffman on November 23, 2019, in chronic care. (Id. at 96–98). Hoffman reported bilateral knee pain and stated that there was a court order that his knee pain be treated. (Id.). Clark advised that she was not aware of any court orders regarding treatment of his knee pain. (Id.). Hoffman requested glucosamine and Clark said she would order it. (Id.). Hoffman also reported chronic rhinitis with intermittent nose bleeding, noting that he had a history of a polyp in the right nostril that decreased air flow. (Id.). He asked to be seen by an ENT and Clark said that she would refer Hoffman to a physician for further evaluation. (Id.).

An examination showed that Hoffman's left and right turbinates were moderately hypertrophied. (Id.). Getachew explains that turbinate hypertrophy, i.e., enlargement of the nasal passageways, can be caused by chronic sinus inflammation, which Hoffman had not shown, environmental irritants, or seasonal allergies. (Getachew Decl. ¶ 37). Clark did not observe a polyp or other nasal abnormality. (2d Med. R. at 96–98). Hoffman's neck was supple without adenopathy or enlarged thyroids and his respiratory function was normal. (Id.). Hoffman reported tenderness in the right and left knee but demonstrated a smooth, steady gait and got on and off the examination table without apparent difficulty. (Id.). Clark prescribed glucosamine. (Id.).

Getachew specifically denies issuing any directive to Clark regarding Hoffman's course of treatment. (Getachew Decl. ¶ 37). Getachew does not, however, disagree with

14

Clark's decision to prescribe glucosamine. (Id.). Although Hoffman reported bilateral knee pain, he did not exhibit any significant abnormalities, such as swelling or difficulty walking, which would have signified that additional medications were clinically indicated. (Id.). Hoffman also had a valid prescription for ibuprofen at the time of his examination. (Id.).

On January 9, 2020, Dr. JoGinder Mehtr evaluated Hoffman in the chronic care clinic. (2d Med. R. at 100–01). Hoffman did not report head, eye, ear, nose, or throat abnormalities, or any complaints regarding his musculoskeletal system. (Id.). Mehtr noted that Hoffman had active prescriptions for glucosamine and Depakote, an anticonvulsant that can be used to treat neuropathic pain. (Id.; Getachew Decl. ¶ 39). Mehtr reported that Hoffman's pain was stable and renewed the glucosamine prescription. (2d Med. R. at 100–01). Mehtr also noted that when he attempted to discuss Hoffman's treatment with him, Hoffman became argumentative and left the room. (Id.).

In his May 5, 2020 Declaration, Getachew avers that an assessment by an ENT is not medically necessary for Hoffman. (Getachew Decl. ¶ 40). Hoffman has not exhibited signs of a left nasal cavity growth since January 1, 2019, and Getachew opines that Hoffman does not require an assessment by an ENT for the moderate hypertrophy he showed on November 23, 2019. (Id.). Getachew explains that this condition is mild and usually resolves on its own without any treatment. (Id.).

Getachew also asserts that Hoffman does not require an orthopedic evaluation for his mild DJD. (Id.). Objective diagnostic testing showed no significant abnormalities which would indicate that surgery or further diagnostic testing was necessary. (Id.). Further,

Hoffman did not exhibit any functional abnormalities in his shoulders, neck, bilateral knees, right foot, or lumbar spine. (Id.). In Getachew's view, Hoffman has been prescribed appropriate medication to manage his joint pain and has access to medical staff through both the chronic care clinic and the sick call process if his symptoms worsen or if he develops new symptoms. (Id.).

Getachew states that he did not deny Hoffman medical treatment for any medical concern or symptom, nor did he disregard or direct anyone to disregard Hoffman's medical needs. (Id. ¶ 41). Getachew posits that he exercised his medical judgment in the treatment he provided to Hoffman and that Hoffman received appropriate medical care for his complaints. (Id.). According to Getachew, at no time did he base Hoffman's care on anything other than his medical judgment, which was formed by examining Hoffman, reviewing medical records, and exercising his independent medical judgment. (Id.).

## C.    <u>Procedural History</u>

On December 20, 2019, Hoffman filed this Complaint against Defendants Asresahegn Getachew, M.D. and Corizon Health alleging that Getachew offered a "slanderous" opinion that Hoffman is a hypochondriac and drug seeker; failed to treat him for degenerative disease in both knees and his right foot, acute paranasal sinusitis, polyp or growth in the left nasal cavity; and refused to give Hoffman a flu shot. (Compl. ¶¶ 4, 25, 29). Although Hoffman fails to expressly state a cause of action, the Court construes the Complaint as attempting to allege a violation of the Eighth Amendment and 42 U.S.C. § 1983. See Fed.R.Civ.P. 8(e) ("Pleadings must be construed so as to do justice."); Jackson v. Jackson, 764 F.App'x 326, 326 (4th Cir. 2019) ("[D]eliberate indifference to an inmate's

serious    medical    needs    violates    the Eighth Amendment and    provides

a cause of action under § 1983.") (citations omitted). Hoffman seeks injunctive relief

mandating that he be seen by an orthopedist and ENT at either the University of Maryland

or Johns Hopkins Hospital and that he be provided an annual flu shot. (Compl. at 11).

Hoffman also seeks compensatory damages and court costs. (Id.).

On April 5, 2020, Getachew filed a Motion to Dismiss or, in the Alternative, Motion

for Summary Judgment. (ECF No. 15). On May 5, 2020, Getachew and Corizon Health

jointly filed a Motion to Dismiss or, in the Alternative Motion for Summary Judgment.

(ECF No. 20). Hoffman filed an Opposition on July 22, 2020. (ECF No. 22).[2] Defendants

filed Replies on July 30, 2020 and August 6, 2020. (ECF Nos. 23, 25).[3]

---

[2] In his Opposition, Hoffman raises additional claims of inadequate medical care. Briefs in opposition to a dispositive motion may not be used to amend a complaint or add new claims. See Zachair, Ltd. v. Driggs, 965 F.Supp. 741, 748 n.4 (D.Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of  motion briefs, amend the  complaint"), aff'd, 141 F.3d 1162 (4th Cir. 1998); Mylan Lab'ys, Inc. v. Akzo, N.V., 770 F.Supp. 1053, 1068 (D.Md. 1991), aff'd, 2 F.3d 56 (4th Cir. 1993). As such, the Court will not consider the new allegations raised in Hoffman's Opposition.

[3] Hoffman subsequently filed a document that was docketed as an "Affidavit," but which is, in fact, an unauthorized surreply. (ECF No. 26). Defendants move to strike the filing. (ECF Nos. 27, 28). Hoffman opposes the Motions to Strike. (ECF No. 29). No party is entitled to file a surreply unless otherwise ordered by the Court. See Local Rule 105.2(a) (D.Md. 2018). Although a district court has discretion to allow a surreply, surreplies are generally disfavored. Chubb & Son v. C & C Complete Servs., LLC, 919 F.Supp.2d 666, 679 (D.Md. 2013). A surreply may be permitted "when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply." Khoury v. Meserve, 268 F.Supp.2d 600, 605 (D.Md. 2003). Here, Hoffman has made no effort to explain to the Court why his surreply is necessary, nor would the substance of the proposed surreply change the Court's ruling on the instant Motions. Accordingly, Defendants' Motions to Strike will be granted.

## II.    DISCUSSION

**A.    <u>Conversion</u>**

Defendants styled their Motions as motions to dismiss under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56. A motion styled in this manner implicates the Court's discretion under Rule 12(d). <u>See</u> <u>Pevia v. Hogan</u>, 443 F. Supp. 3d 612, 625 (D. Md. 2020) (citation omitted). Rule 12(d) provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" <u>Wells-Bey v. Kopp</u>, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, <u>Federal Practice & Procedure</u> § 1366, at 159 (3d ed. 2004 & Supp. 2012)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. <u>See</u> <u>Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.</u>, 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. <u>See</u> <u>Moret v. Harvey</u>, 381 F.Supp.2d 458, 464 (D.Md. 2005) (citing <u>Laughlin v. Metro. Wash. Airports Auth.</u>, 149 F.3d 253, 260–61 (4th

Cir. 1998)). The Court "does not have an obligation to notify parties of the obvious." Laughlin, 149 F.3d at 261.

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To successfully raise the need for additional discovery, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d). A Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." Hamilton v. Mayor of Balt., 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Strag v. Bd. of Trs., Craven Cmty. Coll., 55 F.3d 943, 954 (4th Cir. 1995)).

The Fourth Circuit has warned that it "'place[s] great weight on the Rule 56[d] affidavit' and that 'a reference to Rule 56[d] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate

substitute for a Rule 56[d] affidavit.'" <u>Harrods</u>, 302 F.3d at 244 (quoting <u>Evans</u>, 80 F.3d at 961). Failing to file a Rule 56(d) affidavit "is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." <u>Id.</u> (quoting <u>Evans</u>, 80 F.3d at 961). Despite these holdings, the Fourth Circuit has indicated that there are some limited circumstances in which summary judgment may be premature, notwithstanding the non-movants' failure to file a Rule 56(d) affidavit. <u>See id.</u> A court may excuse the failure to file a Rule 56(d) affidavit when "fact-intensive issues, such as intent, are involved" and the nonmovant's objections to deciding summary judgment without discovery "serve[ ] as the functional equivalent of an affidavit." <u>Id.</u> at 244–45 (quoting <u>First Chi. Int'l v. United Exch. Co.</u>, 836 F.2d 1375, 1380–81 (D.C.Cir. 1988)).

Here, the Court concludes that both requirements for conversion are satisfied. Hoffman was on notice that the Court might resolve Defendants' Motions under Rule 56 because Defendants styled their Motions in the alternative for summary judgment and presented extra-pleading material for the Court's consideration. <u>See</u> <u>Moret</u>, 381 F.Supp.2d at 464. In addition, the Clerk informed Hoffman about the Motions and the need to file an opposition. (<u>See</u> Rule 12/56 Letters, ECF Nos. 16, 21). Hoffman filed an Opposition but did not include a request for more time to conduct discovery. (<u>See</u> ECF No. 22). Because the Court will consider documents outside of Hoffman's Complaint in resolving Defendants' Motions, the Court will treat the Motions as ones for summary judgment.

**B.**   <u>**Standard of Review**</u>

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor.

Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing that there is a genuine dispute of material fact. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 140–41 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citations omitted). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248; <u>accord</u> <u>Hooven-Lewis v. Caldera</u>, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. <u>Anderson</u>, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986).

## C.   <u>Analysis</u>

### 1.   **Respondeat Superior**

Defendant Corizon is a private corporation. A corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of <u>respondeat superior</u>. <u>See</u> <u>Austin v. Paramount Parks, Inc.</u>, 195 F.3d 715, 727–28 (4th Cir. 1999); <u>Powell v. Shopco Laurel Co.</u>, 678 F.2d 504, 506 (4th Cir. 1982); <u>Clark v. Md. Dep't of Pub. Safety and Corr. Servs.</u>, 316 F.App'x 279, 282 (4th Cir. 2009). The doctrine of <u>respondeat superior</u> only attaches liability to employers in § 1983 cases in circumstances where, for instance, a municipality possesses final authority to establish policy with respect to the action ordered. <u>See</u> <u>Monell v. N.Y. City Dep't of Soc. Servs.</u>, 436 U.S. 658, 690 (1978). Here, Hoffman's claims against Corizon are premised entirely on the fact that it employs Getachew. (<u>See</u> Compl. ¶ 28). Accordingly, Corizon is entitled to summary judgment.

22

2.      **Eighth Amendment**

Hoffman alleges that Getachew has interfered in his medical care and failed to provide adequate medical care. The Eighth Amendment prohibits "the unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. Gregg v. Georgia, 428 U.S. 153, 173 (1976); see also Estelle v. Gamble, 429 U.S. 97, 103 (1976). To sustain a claim for denial of medical care under the Eighth Amendment, a plaintiff must show that the defendant's acts or omissions were done with deliberate indifference to a serious medical need. See Estelle, 429 U.S. at 106; see also Anderson v. Kingsley, 877 F.3d 539, 543 (4th Cir. 2017). Deliberate indifference to a serious medical need is defined as "treatment [that is] so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). Accordingly, "[d]eliberate indifference is a very high standard—a showing of mere negligence will not meet it." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999).

Disagreements between medical staff and an inmate over the necessity or extent of medical treatment do not rise to a constitutional injury and will not establish a cause of action under § 1983. See Estelle, 429 U.S. at 105–06. Moreover, the mere failure to treat all medical problems to a prisoner's satisfaction is insufficient to support a claim of deliberate indifference. Peterson v. Davis, 551 F.Supp. 137, 146 (D.Md. 1982), aff'd, 729 F.2d 1453 (4th Cir. 1984).

To the extent that Hoffman contends that Defendants have been deliberately indifferent to his medical needs regarding his lung or breathing issues, DJD, or pain

management, Defendants are entitled to summary judgment. As this Court has found in a

previous lawsuit filed by Hoffman:

> As a preliminary matter, Hoffman's insistence that he has ILD
> or lung cancer is not supported by evidence in the record.
> Hoffman received a chest x-ray and CT scan in early 2016 after
> he reported significant weight loss to his providers. Although
> the technician interpreting the CT scan indicated that
> Hoffman's providers should "[c]onsider chronic interstitial
> lung disease," Hoffman was not diagnosed with ILD at that
> time. Rather, "ILD was merely a suggested consideration." Yet
> after the CT scan, Hoffman repeatedly told his providers that
> he had been diagnosed with ILD or COPD and expressed his
> fears that he had lung cancer, even though Hoffman's
> complaints of severe pain were not supported by or consistent
> with his physical symptoms. Nonetheless, upon Hoffman's
> continued complaints, Defendants performed additional
> diagnostic tests and referred Hoffman to an outside
> pulmonologist and thoracic surgeon for evaluation. These
> physicians confirmed that Hoffman had no signs of lung
> cancer, lung disease, or COPD, concluded that Hoffman's pain
> was musculoskeletal, and referred him to another provider to
> assess for a possible rheumatic condition. Because Hoffman
> does not have lung disease or lung cancer, an MRI, lung
> biopsy, and PET scan are not medically necessary. Prison
> healthcare providers are not constitutionally required to
> perform diagnostic testing upon a prisoner's every request, nor
> are they required to provide medical treatment for a condition
> that a prisoner does not have. As such, Defendants were not
> deliberately indifferent by failing to provide Hoffman with
> further diagnostic testing.

Hoffman v. Barrera, No. GLR-17-2431, 2020 WL 5569529, at *14 & n.3 (D.Md. Sept. 17,

2020) (citations and footnote omitted). To the extent that Hoffman contends that

Defendants failed to prescribe him pain medication, or that Getachew slandered him in

offering his opinion in that case, his claim also fails. In that case, the Court held:

> Hoffman complains that Defendants have refused to give him
> pain medication despite his severe, chronic lung pain. This is

not so. Hoffman's medical record indicates that Defendants provided Hoffman with various medications to treat his pain . . . despite Hoffman's history of drug use, which requires them to give careful consideration before prescribing pain medication. At bottom, Hoffman's mere disagreement with Defendants' selected course of treatment does not give rise to an Eighth Amendment claim. . . .

According to his medical records, the results of Hoffman's 2016 bone scan indicated "minimal degenerative appearing uptake in both knees and the right foot." This result did not indicate DJD, but rather was entirely normal, as "[m]inimal degenerative changes are common to most humans as they age." Thus, although Hoffman complains of joint pain, it does not appear that his pain is the result of untreated DJD.

Furthermore, the record indicates that Defendants have appropriately treated Hoffman's general complaints of joint pain. On at least one occasion Defendants ordered a knee brace for Hoffman upon his request. Defendants also recommended other therapies for Hoffman, such as stretching before physical activity and using ice to alleviate pain. As Hoffman admits, Defendants prescribed him Motrin for pain relief. Although Hoffman believes that referral to an orthopedist and additional pain medication is warranted, his dissatisfaction with Defendants' chosen course of treatment is insufficient to support a claim for deliberate indifference. In all, Defendants have provided Hoffman constitutionally adequate treatment for his knee and foot pain.

Id. at *14–16 (citations omitted). In addition, Hoffman himself repeatedly refused to discuss his alleged medical issues or failed to mention them at his medical visits. (See, e.g., 1st Med. R. at 10–15, 20–21, 24–33; 2d Med. R. at 17–19, 61, 75–76, 100–01, 105–08, 127).

Further, the medical record does not demonstrate that Getachew issued any instructions regarding Hoffman's medical treatment to the medical providers, and Getachew specifically denies doing so. (See generally 1st Med. R., 2d Med. R.; see also

25

Getachew Decl. ¶ 5). On the occasions that Getachew provided direct care to Hoffman, the record demonstrates that the care provided was appropriate. For example, when Getachew examined Hoffman on March 11, 2019, Getachew prescribed naproxen after Hoffman reported that it was effective in relieving his joint pain. (2d Med. R. at 12–14).

As to Hoffman's complaints regarding the left nasal growth, the record demonstrates that (1) Hoffman's complaints regarding a growth in his left nasal cavity were inconsistent; (2) other than the initial assessment of a "pimple" in the nostril, subsequent physical examinations did not show any growth in the cavity; and (3) Hoffman often did not complain of a growth when being examined by medical providers. (See 2d Med. R. at 75–76, 86–87, 90–91, 96–98, 109–12; see also Getachew Decl. ¶¶ 16, 22, 29, 32, 37, 39–40). Moreover, Hoffman's chronic sinus issues were not ignored. (See 2d Med. R. at 5, 24, 49, 72, 81, 109; see also Getachew Decl. ¶¶ 10, 16, 29). To the contrary, he received treatment, medication, and diagnostic testing, and he did not complain of a nasal growth on the occasions when Getachew examined him. (See 2d Med. R. at 12–19, 27–29; see also Getachew Decl. ¶ 14). Moreover, Hoffman himself repeatedly refused to discuss his alleged medical issues or failed to mention them at his medical visits. (See, e.g., 1st Med. R. at 10–15, 20–21, 24–33; 2d Med. R. at 17–19, 61, 75–76, 100–01, 105–08, 127).

"Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (citing Gittlemacker v. Prasse, 428 F.2d 1, 6 (3d Cir. 1970)). In sum, the record demonstrates that Defendants have consistently provided Hoffman with diagnostic testing, referrals to outside physicians, and medication

to alleviate his demonstrated medical conditions and reported pain. For this reason, no reasonable jury could conclude that Defendants were deliberately indifferent to Hoffman's medical needs in violation of his Eighth Amendment rights, and the Court will enter judgment in favor of Defendants.

### 3. Injunctive Relief

In his request for relief, Hoffman suggests that without an injunction he will suffer irreparable harm. A preliminary injunction is an extraordinary remedy. See Munaf v. Geren, 553 U.S. 674, 689–90 (2008) (citing 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice & Procedure § 2948, at 129 (2d ed. 1995)). A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) that the injunction is in the public interest. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); see also The Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346–47 (4th Cir. 2009). To demonstrate a likelihood of irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." Direx Israel, Ltd. v. Breakthrough Med. Grp., 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. See Taylor v. Freeman, 34 F.3d 266, 269 (4th Cir. 1994). Viewed in the light most favorable to Hoffman, the evidence in the record does not establish a likelihood of success on his claim that Getachew and Corizon violated his

Eighth Amendment rights. Accordingly, the Court will deny Hoffman's request for injunctive relief.

### III.   CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motions to Dismiss, or in the Alternative, for Summary Judgment (ECF Nos. 15, 20) and deny Hoffman's request for injunctive relief. Defendants' Motions to Strike (ECF Nos. 27, 28) will also be granted. A separate Order follows.

Entered this 17th day of February, 2021.


_____/s/_____
George L. Russell, III
United States District Judge

28